Filed 8/25/14  Sommerfield v. Wells Fargo Bank CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JEAN LAWRENCE ("LARRY") SOMMERFIELD II et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> WELLS FARGO BANK, N.A., as Trustee, etc. <br><br> Defendant and Respondent. | G048695 <br><br> (Super. Ct. No. 30-2011-00504701) <br><br> O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Randall J. Sherman, Judge.  Reversed.

Bunt & Shaver and David N. Shaver for Plaintiffs and Appellants.

Vogt, Resnick & Sherak, David A. Sherak, and Jeany A. Duff for Defendant and Respondent.

\*          \*          \*

Jean Lawrence Sommerfield II (Larry), on behalf of himself and his mother Jane, petitioned the court for redress from Wells Fargo Bank, N.A. (Wells Fargo). (See Prob. Code, §§ 16420, 17200.)[1] When Wells Fargo took over as trustee of the Sommerfield family trust (The Trust), Jane was insured through Larry's company under a Blue Shield preferred provider organization (PPO) plan. Wells Fargo assisted in converting Jane's Medicare benefits into a Blue Shield Medicare Advantage health maintenance organization (HMO) plan. The selection of this plan negatively affected Jane's ability to maintain care with existing physicians. Moreover, Wells Fargo did not instigate the cancellation of the PPO plan already in place, "thereby creating double insurance costs." By these acts and omissions, Wells Fargo allegedly violated its statutory duties as trustee under the Probate Code, plus additional obligations incurred as a result of its representations concerning its experience and competency in providing elder care services.

Wells Fargo moved for summary judgment. The court found (and Wells Fargo conceded on appeal) "there are triable issues of fact as to whether or not [Wells Fargo] breached its fiduciary duties."[2] But the court granted summary judgment on two alternative grounds: (1) there was no evidence of damages; and (2) Wells Fargo had a complete defense to the claim based on an exculpatory clause in the Trust. We reverse.

---

[1] All statutory references are to the Probate Code unless otherwise stated.

[2] "The violation by a trustee of any duty owed to the beneficiaries of the trust constitutes a breach of trust. [Citation.] Such duties include the duty of loyalty, the duty to avoid conflicts of interest, the duty to preserve trust property, the duty to make trust property productive, the duty to dispose of improper investments, and the duty to report and account." (*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1998) 68 Cal.App.4th 445, 462.)

FACTS

Our review of the court's grant of summary judgment is de novo. (*Benson v. Superior Court* (2010) 185 Cal.App.4th 1179, 1185.) We review the evidence "in the light most favorable" to Larry. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843.)

*Background Information Concerning the Trust and the Sommerfield Family*

Jane and her husband Jean were the settlors and original trustees of the Trust. Jean died in April 2007. Jane became the sole beneficiary of the Trust at that time. Other family members, including Larry, are residual beneficiaries of the Trust. Jane is in her nineties. She struggles with a variety of medical problems and has depended on the Trust to manage her affairs, including the payment of living expenses.

Since Jean's death, Larry has been Jane's attorney in fact for health care decisions pursuant to a 1999 document. Starting in May 2005, Larry and his sister Sue Ann Davidson served as co-attorneys in fact for Jane with regard to more general financial decisions.[3]

Larry is a certified public accountant and a California lawyer. He owns a company called Direct Print Communications, Inc. (Direct Print), which has been in operation since 2000. Larry has been "intricately involved in [his] parents' healthcare since right around 2000. They would rely on [him]. And that's why they gave [him] medical directive power of attorney." Larry made "[e]very major medical decision" for Jane as of 2009 (when Wells Fargo took over as trustee).

---

[3] Davidson resigned this position in October 2011, leaving Larry as the sole attorney in fact for Jane since that time. Davidson's resignation was triggered by a separate proceeding brought against her by Larry in connection with the same dispute at issue in this case.

Larry's parents had a Blue Shield PPO health insurance plan through a company they (and later Larry) owned; this company obtained its group plan insurance through a trade group. When the company ceased operations, Larry's father asked Larry to continue health insurance for himself and Jane with the same PPO plan. Larry obliged; Direct Print obtained the same PPO plan from the same trade group.

*Wells Fargo as Trustee and Provider of "Elder Services"*

In January 2009, at the invitation of Jann Watenpaugh of Wells Fargo, Jane entered Wells Fargo's elder services program. One service in the elder service package was "Health Care Planning and Coordination that may include the facilitation of health and wellness assessments; *arranging for the coordination of Medicare and insurance benefits*; review of hospital, nursing home and care center alternatives; advocating for Client at care conferences; and assisting with the selection of care managers, caregivers and additional service providers consistent with Client needs and wishes." (Italics added.) Other elder services documentation indicated that Wells Fargo would, among other things, "Access, review and retain financial and health care documents" and "Assist in the selection and coordination of medical and health care services." Consideration to Wells Fargo for providing elder services consisted of a fee percentage of Jane's managed assets.

On March 9, 2009, Wells Fargo (through corporate officers, not Watenpaugh) accepted appointment as a successor trustee of the Trust. At all relevant times (i.e., since March 2009 when Wells Fargo became trustee), Watenpaugh served as the sole trust officer for the Trust.

*Watenpaugh Participates in Electing Medicare HMO*

On August 28, 2009, Watenpaugh sent an e-mail to Larry with the subject line "Medical Bills." Among other things, this e-mail stated, "At the end of the year we

4

evaluate the medical bills against all certified plans. They do this matching doctors, coverage etc. If we find a program that is less expensive and is service wise identical we may switch her coverage." Watenpaugh wanted to lower Jane's insurance rates. Watenpaugh was frustrated at the end of 2009 because Larry had not responded regarding the question of switching Jane's insurance.

Davidson informed Watenpaugh that "the window [was] closing" to enroll Jane in a Medicare plan. Davidson located the same HMO form she had used for her husband. Watenpaugh told Davidson to fill out the form for Jane. After receiving the completed paperwork from Davidson, Watenpaugh submitted the HMO application by e-mail on December 24, 2009, copying Davidson. The Medicare HMO did not result in any out of pocket costs to the Trust; there were no premiums charged or paid.

In April 2011, health care providers informed Larry they could not treat Jane because she had signed up for an HMO plan. Larry "believed Wells Fargo had extensive experience in health insurance related matters, based on their verbal representations, written materials, and course of conduct." "At no time did . . . Watenpaugh . . . or any representative with Wells Fargo . . . ever discuss with [Larry] a specific alternative health insurance plan for [his] mother, Jane . . . ."[4]

---

[4] In her declaration, Watenpaugh attempts to deflect blame from herself and Wells Fargo. Wells Fargo "never represented . . . that it had experience in insurance matters." "Wells Fargo had no power to effectuate any change in [Jane's] insurance coverage." "Wells Fargo never directly paid any premiums for [Jane's] healthcare insurance. However, at the request of Larry, Wells Fargo began reimbursing his company, Direct Print . . . , for premiums that it paid on behalf of [Jane] for healthcare insurance." Larry refused to discuss high premiums charged on this PPO policy or the fact that Jane was on an employer group plan even though she was not an employee. Watenpaugh repeatedly requested copies of the PPO policy and other information, but was rebuffed. "The Trust [was] never notified that the HMO Plan had been implemented, never received a bill for payment of any premiums for the HMO Plan, and never paid any such premiums."

With the benefit of hindsight, Larry asserts his parents could have received equivalent coverage with a Medicare supplemental plan (rather than continuing to receive employer-provided coverage through Direct Print). Larry succeeded in changing Jane to the Medicare PPO supplemental insurance around June 2011. It cost approximately $500 per month for a PPO plan supplementing Medicare, as opposed to the approximately $1,600 to $1,800 per month paid for Jane's PPO insurance through Direct Point.[5]

In this lawsuit, Larry seeks the difference between the cost of the Medicare PPO supplemental insurance and the Direct Point PPO insurance, which he calculates as $24,485.94 from December 2009 through June 2011. In taking the initiative to remedy the alleged breaches by Wells Fargo, Larry lost three weeks of his own time and an employee's time, which he valued at $38,400 and $2,980.80, respectively. Direct Print also lost approximately $22,000 as a result of a business opportunity ruined by these events.

## DISCUSSION

Summary judgment may be granted to a defendant if it is shown that the plaintiff cannot establish one or more elements of his cause of action or that there is a complete defense to the claim. (Code Civ. Proc., § 437c, subd. (p)(2).)

---

[5] There is a copy of Jane's unsigned Medicare card in the record, which indicates an effective date of February 1, 1984. At his deposition, Larry stated that the trade group, Blue Shield, Wells Fargo, and the previous bank trustee "were all negligent in failing to advise [his] parents that they could have accessed the same basic healthcare coverage for a lot less money by using Medicare as a primary insurer and then getting a Blue Shield PPO Medicare supplemental plan that cumulatively would provide the same level of coverage that the primary PPO plan provided, if not better." This suggests Wells Fargo is being sued for not doing something any number of parties (including Jane herself and Larry himself) might have done as many as 25 years before — relying on Medicare and a supplemental policy rather than employer insurance obtained through family-owned companies.

*The Court Erred in Concluding There Was No Evidence of Damages*

"If the trustee commits a breach of trust, the trustee is chargeable with any of the following that is appropriate under the circumstances: [¶] (1) Any loss or depreciation in value of the trust estate resulting from the breach of trust, with interest." (§ 16440, subd. (a)(1).) There is evidence that Jane's employer-based PPO coverage could have been cancelled and replaced with Medicare and a Medicare PPO supplement in December 2009. There is evidence that this option would have reduced Jane's premiums significantly (which were ultimately paid for by the Trust) without affecting her access to preferred medical providers (as the HMO option did). Larry succeeded in making this transition happen in June of 2011.

Wells Fargo responds to this straightforward analysis by trying to change the subject, essentially reinserting the question of breach into the damages analysis. It is true Wells Fargo provided some of the services it promised. It is true there is evidence suggesting Larry was not particularly helpful or responsive at all times. It is true Wells Fargo could not, by itself, bind Jane to a policy of insurance. It is true there is plenty of blame to go around with regard to the failure to switch Jane's health insurance to a lower cost Medicare option before her mid-nineties. It is also true that the Medicare HMO plan (which Watenpaugh aided in procuring in 2009 and 2010) did not cause the Trust to accrue additional premiums, as it was essentially paid for by Jane's government provided standard Medicare benefit. But none of these facts eliminate the loss of funds expended on the unnecessary employer PPO plan.

Hence, just as there is a triable issue of fact as to whether Wells Fargo breached its duty as trustee by failing to effect an appropriate change in Jane's health insurance in December 2009, there is also a triable question of fact as to whether the Trust lost approximately $24,000 in value as a result of this failure. There is no need to address the other damages alleged by Larry, which have a much more tenuous connection with the value of the Trust estate.

7

*Exculpatory Clause Does Not Entitle Wells Fargo to Summary Judgment*

We turn to the alternative ground upon which the court granted summary judgment, the exculpatory clause in the Trust. "[T]he trustee can be relieved of liability for breach of trust by provisions in the trust instrument." (§ 16461, subd. (a).) But "[a] provision in the trust instrument is not effective to relieve the trustee of liability (1) for breach of trust committed intentionally, with gross negligence, in bad faith, or with reckless indifference to the interest of the beneficiary, or (2) for any profit that the trustee derives from a breach of trust." (*Id*., subd. (b).)

A clause in the Trust entitled "Trustee's Liability" states in relevant part: "Trustee in carrying out its powers and performing its duties may act in its discretion. *No trustee (other than a corporate trustee) shall be liable to any beneficiary or any heir of either of Grantors for that trustee's acts or failure to act, unless the act or failure to act constituted willful misconduct, gross negligence, bad faith or fraud*. Trustee, however, shall never have personal or corporate liability for making or failing to make any discretionary distributions to any beneficiary or any election under any tax law. *Trustee shall not personally or corporately be liable for any act or omission of any agent or employee of Trustee unless Trustee has acted in bad faith in the selection and retention of such agent or employee*." (Italics added.)

Wells Fargo asserts the second italicized sentence defines its potential liability in this case. Watenpaugh was an employee of Wells Fargo. Watenpaugh is the only individual actor against whom evidence of breach of trust has been presented. There is no evidence in the record that Wells Fargo (the corporate trustee) acted in bad faith in its selection or retention of Watenpaugh (the individual employee). Thus, Wells Fargo is not "personally or corporately" liable for any of Watenpaugh's acts or omissions. The strength of Wells Fargo's case is in the plain language of one sentence of the Trust.

8

Conversely, Larry contends the first italicized sentence (i.e., "*No trustee (other than a corporate trustee) shall be liable to any beneficiary*") should be the focus of our analysis. Wells Fargo, as a corporate trustee, does not enjoy the benefit of this exculpatory clause, which tracks section 16461, subdivision (b). Instead, Wells Fargo is subject to the standard duty of care of a trustee: "The trustee shall administer the trust with reasonable care, skill, and caution under the circumstances then prevailing that a prudent person acting in a like capacity would use in the conduct of an enterprise of like character and with like aims to accomplish the purposes of the trust as determined from the trust instrument." (§ 16040, subd. (a).)

According to Larry, the second italicized sentence is either void because it violates section 16461, subdivision (b) and related Probate Code sections, or it was not intended to apply to a corporate trustee in the manner advanced by Wells Fargo. Instead, this provision was intended to apply to situations in which trustees (whether individual or corporate) hired "accountants, attorneys, auditors, investment advisers, appraisers," or other specially retained agents, "to advise or assist the trustee in the performance of administrative duties." (See § 16247.)

In particular, Larry posits that the second italicized sentence in the "Trustee's Liability" section was intended to replace or supplement section 16401, subdivision (b)(3): "(a) Except as provided in subdivision (b), the trustee is not liable to the beneficiary for the acts or omissions of an agent. [¶] (b) Under any of the circumstances described in this subdivision, the trustee is liable to the beneficiary for an act or omission of an agent employed by the trustee in the administration of the trust that would be a breach of the trust if committed by the trustee: (1) Where the trustee directs the act of the agent. [¶] (2) Where the trustee delegates to the agent the authority to perform an act that the trustee is under a duty not to delegate. [¶] (3) Where the trustee does not use reasonable prudence in the selection of the agent or the retention of the agent selected by the trustee. [¶] (4) Where the trustee does not periodically review the agent's

9

overall performance and compliance with the terms of the delegation. [¶] (5) Where the trustee conceals the act of the agent. [¶] (6) Where the trustee neglects to take reasonable steps to compel the agent to redress the wrong in a case where the trustee knows of the agent's acts or omissions." (§ 16401.) By Larry's reasoning, the second italicized sentence (assuming it is valid) was intended to raise the bar for liability from "reasonable prudence" to "bad faith" in the selection or retention of agents hired to perform specialized tasks, not to exempt corporate trustees from liability for the acts of its employees.

As the court's interpretation of the exclusionary clause did not turn on extrinsic evidence, we interpret the Trust de novo. (*Estate of Hilton* (1988) 199 Cal.App.3d 1145, 1170.) "The words of an instrument are to receive an interpretation that will give every expression some effect, rather than one that will render any of the expressions inoperative." (§ 21120.) "All parts of an instrument are to be construed in relation to each other and so as, if possible, to form a consistent whole. If the meaning of any part of an instrument is ambiguous or doubtful, it may be explained by any reference to or recital of that part in another part of the instrument." (§ 21121.) Exculpatory clauses are "subject to the rule of strict construction." (*Estate of Collins* (1977) 72 Cal.App.3d 663, 673.)

We agree with Larry's interpretation of the "Trustee's Liability" section of the Trust. Wells Fargo, not Watenpaugh, was the trustee. But as a corporation, Wells Fargo can only act through its employees. (See *Burwell v. Hobby Lobby Stores, Inc.* (2014) ___ U.S. ___ [134 S.Ct. 2751, 2768] ["Corporations, 'separate and apart from' the human beings who own, run, and are employed by them, cannot do anything at all"].) In seeking to limit its liability to the realm of its decisions to hire and retain Watenpaugh, Wells Fargo suggests that every corporate trustee is delegating to others (its employees) the entire administration of the trust, conduct explicitly forbidden by the Probate Code. (§ 16012, subd. (a) ["The trustee has a duty not to delegate to others the performance of

10

acts that the trustee can reasonably be required personally to perform and may not transfer the office of trustee to another person nor delegate the entire administration of the trust to a cotrustee or other person"].)

The Trust's basic exculpatory clause (the first italicized sentence) specifically excludes corporate trustees from its scope, thereby imposing a higher duty of care on corporate trustees than that imposed on individual trustees. Contrary to sound principles of interpretation, Wells Fargo reads the first italicized sentence out of the Trust with regard to corporate trustees. Wells Fargo's interpretation only works by ignoring all context, including the language of the Trust, the background Probate Code provisions against which the Trust was drafted, and general principles of respondeat superior liability. If Wells Fargo were correct, corporate trustees would gain more out of the "Trustee's Liability" section of the Trust than individual trustees (who are often family members; indeed, Jean and Jane were the initial trustees of the Trust). A better interpretation of the second italicized sentence treats the phrase "agent or employee" as inapplicable to employees of a corporate trustee. The settlors of the Trust did not intend for a corporate trustee like Wells Fargo to escape liability in all cases in which it did not hire or retain in bad faith the particular employee working on Trust business.

In sum, the court erred in its interpretation of the Trust. Wells Fargo is not entitled to summary judgment based on the "Trustee's Liability" section of the Trust.

11

DISPOSITION

The judgment is reversed.  Larry shall recover costs incurred on appeal.


IKOLA, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


MOORE, J.

12